ROGER M. SCHRIMP (SBN 39379)
CLINTON P. WALKER (SBN 151560)
**DAMRELL, NELSON, SCHRIMP,**
  **PALLIOS, PACHER & SILVA**
1601 I Street, Fifth Floor
Modesto, CA 95354
Telephone: (209) 526-3500
Facsimile: (209) 526-3534
rschrimp@damrell.com
cwalker@damrell.com

MICHAEL P. LEHMANN (SBN 77152)
CHRISTOPHER L. LEBSOCK (SBN 184546)
JON T. KING (SBN 205073)
ARTHUR N. BAILEY (SBN 248460)
**HAUSFELD LLP**
44 Montgomery St., Suite 3400
San Francisco, CA 94104
Tel:  (415) 633-1909
Fax:  (415) 358-4980
mlehmann@hausfeldllp.com
clebsock@hausfeldllp.com
jking@hausfeldllp.com
abailey@hausfeldllp.com

[Additional counsel listed on signature page]

*Counsel for Plaintiff Bruce Foods Corporation*
*and the proposed Class*

## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| BRUCE FOODS CORPORATION, on behalf of itself and all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| SK FOODS, LP; INGOMAR PACKING COMPANY, LLC, LOS GATOS TOMATO PRODUCTS, INTRAMARK USA, INC. and RANDALL LEE RAHAL, | |
| Defendants. | |

*/ / /*

CLASS ACTION COMPLAINT

**INTRODUCTION**

1.      Plaintiff Bruce Foods Corporation brings this action both individually and on behalf of a Class of plaintiffs consisting of all persons and entities in the United States, who purchased directly from defendants processed tomato products, including but not limited to tomato paste, diced tomatoes, and tomato sauces ("Processed Tomato Products") starting at least as early as February of 2006 through the present (the "Class Period").

2.      Defendants are processors of tomato products including tomato sauces, tomato paste and diced tomatoes.  Defendants collectively sell millions of dollars worth of Processed Tomato Products every year.

3.      Plaintiff alleges that during the Class Period, defendants conspired, combined and contracted to fix, raise, maintain and stabilize prices at which Processed Tomato Products would be sold.  As a result of defendants' unlawful conduct, plaintiff and the other members of the proposed Class paid artificially inflated prices that exceeded the amount they would have paid if a competitive market had determined prices for Processed Tomato Products.

**JURISDICTION AND VENUE**

4.      Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, (15 U.S.C. §§ 15 and 26), to recover treble damages and costs of suit, including reasonable attorneys' fees, against defendants for the injuries sustained by plaintiff and the members of the Class by reason of the violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

5.      This action is also instituted to secure injunctive relief against defendants to prevent them from further violations of Section 1 of the Sherman Act, as hereinafter alleged.

6.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

7.      Venue is proper in this Judicial District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C § 1391(b), (c) and (d) because during the Class Period, defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

8.      This Court has personal jurisdiction over each defendant because, *inter alia*, each defendant: (a) transacted business throughout the United States, including in this District; (b) sold Processed Tomato Products throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.  Further jurisdictional contacts are alleged below.

## PLAINTIFF

9.      Plaintiff Bruce Foods Corporation ("Bruce Foods") is a Louisiana corporation with its principal place of business located in New Iberia, Louisiana.  Bruce Foods specializes in manufacturing Cajun and Tex Mex food products and is one of America's largest privately-owned food manufacturers.  Its products are distributed throughout the U.S. and in more than 100 countries, and are carried by most of the top retail grocery chains worldwide.  During the Class Period, Bruce Foods purchased Processed Tomato Products directly from one or more defendants, including Defendant SK Foods.  As a result of the alleged conspiracy, plaintiff was injured in its business or property by reason of the antitrust violations alleged herein.

## DEFENDANTS

10.     Defendant SK Foods, LP ("SK Foods") is a California limited partnership that has its principal place of business in Lemoore, California.  SK Foods is a grower and processor of vegetable products, including tomatoes, for re-manufacturers, retail and foodservice marketers.  Its products include aseptic bulk industrial tomato products, including without limitation, diced tomatoes and tomato paste, and hot fill ready-to-use sauces and formulated sauces for foodservice and retail glass jars.  During the Class Period, SK Foods sold to customers in this district and other locations in the United States.

11.     Defendants Ingomar Packing Company, LLC ("Ingomar") is a limited liability company with its principal place of business in Los Gatos, California.  Ingomar states it "is a producer of premium quality California Tomato Paste" and that "a majority of the tomatoes that are processed to make our paste is drawn from fields cultivated by our owners."  Ingomar's

products include cold break tomato paste, hot break tomato paste, and concentrated crushed hot break tomato paste.   These products are sold in 300 gallon aseptic bags in bins, 55 gallon drums, and in 55 gallon aseptic bags in drums.  Ingomar also sells diced tomatoes in juice containers and in aspectic bags (in bins or drums.)  During the Class Period, Ingomar sold Processed Tomato Products to customers in this district and other locations in the United States.

12.     Defendant Los Gatos Tomato Products ("Los Gatos") is a grower-owned tomato paste processing facility with its principal place of business in Huron, California.  Los Gatos is a partnership of four family farming operations.  Processed tomato products produced by Los Gatos include various grades of hot break tomato paste, crushed tomatoes products, and various grades of cold break tomato paste.  During the Class Period, Los Gatos sold Processed Tomato Products to customers in this district and other locations in the United States.

13.     Defendant Intramark USA, Inc. ("Intramark") is a New-Jersey-based company holding itself out as a wholesaler of food ingredients, including Processed Tomato Products. Intramark operates as a sales broker of Processed Tomato Products from SK Foods and other companies.

14.     Defendant Randall Lee Rahal ("Rahal") is the owner and operator of Intramark. Rahal is a resident of New Jersey and has served as President of Intramark since 1990.  From at least 1993 until April 2008, Rahal was an agent of, a partner of, or was associated with SK Foods. Rahal acted as an advisor or supervisor of SK Foods, giving direction to and receiving periodic reports regarding various aspects of SK Foods' business from SK Foods employees.  From at least 2004 until April 2008, Rahal served on the board of directors of SK Foods.  Through Intramark, Rahal served as a broker for SK Foods and in that capacity he oversaw, among other things, the negotiation of contracts involving the sale of Processed Tomato Products between SK Foods and many of its customers.

15.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

16.     All acts alleged in this Complaint to have been done by defendants were performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of defendants' business affairs.

## CO-CONSPIRATORS

17.     Various other persons, firms, corporations and entities have participated as unnamed co-conspirators with defendants in the violations and conspiracy alleged herein.  In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.

18.     At all relevant times, each defendant was an agent of each of the remaining defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency.  Each defendant ratified and/or authorized the wrongful acts of each of the defendants.  Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts and transactions that are the subject of this action.

## INTERSTATE TRADE AND COMMERCE

19.     The business activities of defendants that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

20.     During the Class Period, defendants sold substantial quantities of Processed Tomato Products in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States.

## FACTUAL ALLEGATIONS

### THE U.S. PROCESSED TOMATO PRODUCTS MARKET

21.     The U.S. tomato processing industry, comprised primarily of tomato pastes, sauces and canned tomato products, is separate from the fresh market industry.  Specific characteristic differences separate tomatoes entering the two markets.  Fresh market varieties are juicier and harvested when immature, while processing varieties contain higher percentages of soluble solids, are vine-ripened, and have a thicker skin than fresh market tomatoes to survive mechanical harvesting and bulk transport.  The marketing methods of the two industry segments differ as well.

The majority of fresh tomatoes are handpicked and sold on the open market, while all processed tomatoes are mechanically harvested and sold under contract between growers and processing firms.  Processing tomato products are most often classified as one of four major subcategories: tomato paste, tomato sauces, ketchup, and other products which mainly consist of puree, whole canned tomatoes, and juices.  More than 70 percent of processed tomatoes are used in tomato paste.  Tomato paste is manufactured and packaged into large bags, placed into boxes and barrels, and stored for use up to 18 months later.

22.     The U.S. processed tomato products market was a $1.88 billion dollar industry in 2007.  The U.S. processed tomato industry has moved westward over the past several decades to California, which grows and processes 95 percent of the U.S. crop. By itself, California is the world leader in the production of processed tomatoes.  Over time, U.S. per acre yields for processing tomatoes have continued to trend higher, moving from 14.5 short tons per acre in 1961 to more than 40 short tons in 2004.  Improved production and harvest technology plus the shift of production from low-yielding states to California accounted for much of the gain in yields.

23.     The processed tomato products market can be divided into two distinct sectors: marketers and remanufacturers.  Marketers are firms that produce processed tomato products primarily for the purpose of selling to another party.  Remanufacturers utilize the processed tomato products internally to make retail and foodservice packs of soups, sauces, ketchup and paste.  Leading marketers include defendants Ingomar, Los Gatos, and SK Foods.

24.     Processing tomatoes are harvested from the field by tomato harvesters which drive directly over a row, or bed, of tomatoes, separating the main plant from its roots by an oscillating clipper.  It is equipped with opto-electronic sorters that enable the harvesters to remove dirt and sub-ripe tomatoes and keep only the operator-specified level of ripe tomatoes.  The tomatoes are brought by truck to the processing facilities where they are graded by third party technicians who take a sample from each incoming trailer and perform various tests including tests for mold, green tomatoes, color and sugar content.  After grading, the tomatoes are separated according to product use to manufacture: tomato paste, diced tomatoes, or tomato sauce.

25.     The bulk of the paste goes through either a "hot" or "cold" break.  Each produces a different type of paste.  Cold break is used in products where a thin consistency is desired, such as

beverages and soups.  Hot break is used where a thick consistency is desired, such as ketchup and sauces.  The paste is next passed through different finisher screens to eliminate seeds and residue. It is then passed through evaporators to remove excess water, and flash coolers to bring the product to a reasonable temperature for packaging.  Finally, fillers put the product into bulk drums and boxes where it is shipped to its destinations if the firm is a marketer, or turned into a retail product if the firm is a remanufacturer.

26.      According to a 2008 Westcon Foods Estimated Processors Breakdown and statistics from the United States Department of Agriculture's ("USDA") National Agricultural Statistics Service, the processed tomato market is largely dominated by the marketers.  Marketers have a 74 percent market share, with the remaining 26 percent going to the remanufacturers.

**FACTORS INCREASING THE MARKET'S SUSCEPTIBILITY TO CONSPIRACY**

27.      Publicly available data on the Processed Tomato Products industry supports the existence of a price-fixing cartel.  Factors which support the existence of a cartel include: 1) a high degree of industry concentration; 2) significant barriers to entry; 3) inelastic demand; 4) the lack of available substitutes for the goods involved; 5) a standardized product with a high degree of interchangeability between the goods of cartel participants; 5) similar cost structures and production processes; 7) absence of a competitive fringe of sellers; 8) declining demand; and 9) recent rapid price increases.

**Highly Concentrated Industry**

28.      A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among possible co-conspirators and makes it more difficult for customers to avoid the effects of collusive behavior.  The market for processed tomato products is highly concentrated, and defendants control a significant percentage of the sales of these products in the U. S. by marketers.  The Herfindahl-Hirshchman Index ("HHI") is a measure of industry concentration that economists often use to quantify the degree of market concentration. The U.S. Department of Justice ("DOJ") considers an HHI higher than 1800 to be a highly concentrated market.  Based on publicly available data for the processed tomatoes market, the HHI based exclusively on this group of marketers is 1888.  Therefore, the market for processed tomato products would have been susceptible to collusion by suppliers.

**Significant Barriers to Entry**

29.     The effect of a collusive arrangement that raises product prices above competitive levels is normally to attract new entrants to the marketplace who want to benefit from the supra-competitive pricing.  However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.  In the processed tomato products market, there are significant barriers to entry.  The barriers to entry arise primarily from the need for significant start-up capital expenditures, available fertile farming space with the necessary climate, distribution infrastructure and long-standing customer relationships.

30.     The majority of U.S. grown processing tomatoes are grown in the California's Central Valley, including Stockton, Modesto, Chico, Bakersfield, and Fresno.  California has the required climate and soil, but also has inherently superior soil fertilization and specific weather conditions that limit disease population.  It would be difficult for new entrants to expand production significantly outside this region.  In addition, the extensive customer networks and name recognition of current suppliers in the market would make it difficult for a new entrant to overcome the advantages enjoyed by existing large firms in the market.

31.     With such barriers to entry, those few firms who are able to enter the market then benefit from economies of scale.  With a high entry cost, a firm reduces its average cost by producing more output.  The firms in the market then have the motivation to keep other firms out, to keep their market share up, and to collude in order to keep prices up.

**Inelastic Demand**

32.     Inelastic Demand means that increases in price result in limited declines in quantity sold or consumed in the market.  In order for a cartel to profit from raising prices above competitive levels, demand must be inelastic at competitive prices.  Otherwise increased prices would result in declining revenues and profits.  There is evidence that the demand for processed tomato products is inelastic.  The income spent on food constitutes a small portion of the average U.S. household income, and the share of tomatoes is miniscule.  It is well established that goods which form a small share of consumer expenditure exhibit inelastic demand. Consumers are less likely to change consumption patterns when the effect of price increases is small.  Moreover, the actual value of the price elasticity of demand for all processed tomato products has been calculated

and shown to be near zero.  This implies processed tomato products are not sensitive to price changes.  Inelastic demand means a cartel would be more likely to occur because the product suppliers would be able to raise their prices without losing sales revenues.

**Lack of Substitutes**

33.     The lack of available substitutes means that a potential cartel would have a greater chance of being successful.  With no substitutes, producers of the product in question would be able to raise product prices without losing significant sales.  Consumers would have little choice but to pay the new, higher price.  For the firms who make retail products from processed tomatoes, there are no available substitutes at any price.  Their products are simply modified versions of the processed tomatoes that they purchase directly from the marketers.  In order to make ketchup, spaghetti sauce, pizza sauce, stewed tomatoes and all the other retail tomato products, there is no substitute for the industrial tomato products that are purchased from the marketers.

**Standardized Product with High Degree of Interchangeability**

34.     A commodity-like product is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market.  When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier to agree on a single price for the good in question and it is easier to effectively monitor those prices. This makes it easier to form and sustain a cartel.  Products here may differ slightly in color or taste, but one supplier's product is highly substitutable with another's.  The market for processed tomatoes is structured so that there is a high degree of substitutability across products from different suppliers. The calculated elasticity of product substitution is high, reflecting the fact that tomato products are relatively close substitutes for each other.  Purchasers demand consistency across products to effectively produce and market their signature sauces, pastes and other products.

35.     With standardized products, it is easier for conspirators to monitor each other's prices and to reach agreements about collusive prices.  One reason that products at issue here are standardized across suppliers is that there is little differentiation in the inputs in the processed tomato products.  According to the University of California's "Processing Tomato Production in California" Report, 60 percent of the production comes from five specific varieties of tomatoes: the AB2, Heinz 9780, Heinz 9557, Halley 3155, and Hypeel 303.  These strains are chosen based on

yield potential, earliness, and nematode and disease resistance. Defendants do not differentiate the product. It is the retail industry which adds the company-specific flavor to processed tomato products. It is against defendants' interests to differentiate their product in any way, because it makes their product less desirable to their clients. These standardized products make collusion easier.

## Similar Cost Structures and Production Processes

36.     The more similar firms are in a market with respect to their costs and to their production methods, the easier it will be for them to collude. The method of producing processed tomato products is similar across the industry, from planting to final delivery. The same types of tomatoes are grown in the same way, in the same geographic location. Since 1990, growers have trended from direct seeding to transplanting. Transplanting simplifies seedbed preparation and stand establishment, reduces weed competition, and reduces hand-weeding expenses.

## Absence of a Competitive Fringe of Sellers

37.     Companies that are not part of the conspiracy can eat away at conspirators' market shares by offering the product at a lower, more competitive price. This reduces revenue and makes sustaining a conspiracy more difficult. In the market for processed tomato products, there exists evidence that no such fringe of competitive sellers exists. The defendants account for a significant percentage of the market, and the remainder of the market is dominated by a handful of other firms.

## Declining Demand

38.     Static or declining demand is another factor which makes formation of a collusive arrangement more likely. With static demand firms have a greater incentive to collude to avoid price competition. Static demand makes it easier to monitor compliance with the price-fixing agreement. According to data from the USDA's Economic Research Service, the per capita consumption of processed tomatoes has been slowly declining since 1990. Along with declining demand, 2007 had a record high supply of over 40 million pounds of tomatoes for processing. Not only is the overall magnitude of the supply increasing, but the yield per acreage has steadily been increasing for the past three decades and still continues to grow. Basic economic theory teaches that prices should not continually rise over an extended period of time in the face of declining

demand and increasing supply.

## CONSPIRATORIAL PRICE INCREASES

39.     The alleged conspiracy was successful in raising prices for processed tomato products in recent years, despite the absence of any justifications for such price increases. The U.S. Bureau of Labor Statistics Producer Price Index ("PPI") shows that tomato products have consistently been increasing since 1990 and have risen sharply over the past six years.  Likewise, data from the California Tomato Growers Association shows that the price per ton for processing tomatoes remained fairly stagnant from 2000-04 (ranging from a high of $58.60 in 2000 to a low of $56.80 in 2002), but has increased significantly recently from $57.40 in 2004 to $72.35 in 2007. Tomato prices rose 16 percent in the year ending in August of 2008, while food prices overall rose only about 6 percent, according to the PPI.  In combination with the declining demand and increasing supply mentioned above, such a persistent and unsubstantiated increase in price over time suggest the existence of an anti-competitive price-fixing cartel.

## CONSPIRACY FURTHERED THROUGH TRADE ASSOCIATIONS

40.     The defendants participate in trade association activities, fostering the conspiracy alleged herein.  In 2006, SK Foods, Ingomar and Los Gatos joined forces to create the California Tomato Export Group ("CTEG") to jointly export processed tomato products.  In its application to the Department of Commerce International Trade Administration ("ITA"), the CTEG sought certification for various activities including establishing export sale prices; to engage in joint bidding or other joint selling arrangements, to make agreements on quantities of processed tomatoes to be exported, and to allocate geographic areas or countries in export markets and/or customers in the export markets among its members.  The ITA issued CTEG an Export Trade Certificate of Review providing protection to CTEG from private treble damage antitrust actions and government criminal and civil suits under Federal and state antitrust laws for export conduct specified in the Certificate and carried out in compliance with its terms and conditions.  The CTEG provided defendants the opportunity to engage in prohibited conduct related to domestic price-fixing beyond the scope of the ITA immunity.  The CTEG was disbanded in May of 2008 shortly after the FBI raided the offices of tomato processors.  The CTEG is part of an ongoing federal antitrust investigation.

41.      Defendants Ingomar, Los Gatos, and SK Foods are members of the Tomato Product Wellness Council ("TPWC").  Created in 2006, the TPWC is an organization of tomato growers, processors and well-known brands working to create awareness of the health benefits of tomato products by providing industry-wide leadership, communications and scientific research. The TWPC funds scientific research investigating the benefits of consuming a diet rich with tomato products.

42.      Defendants Ingomar, Los Gatos, and SK Foods are also members of the California League of Food Processors ("CLFP"), a not-for profit trade association.  Founded in 1905, the CLFP represents fruit and vegetable processors having production facilities in California.  The CLFP is "primarily devoted to furthering the interests of the food processing industry before the State Legislature and regulatory agencies, and is also a major representative for the industry at the Federal level."  The CLFP asserts that it "maintains a daily presence in the halls of State government."  The CLFP's purpose is to foster a favorable environment for the growth and strength of the industry within the state. The CLFP states that "our current membership includes the most powerful brand names in the United States food business, as well as the largest producers of private label and institutional food products."  In addition to active processor members, the CLFP also has affiliate members consisting of industry suppliers.  Alan Huey of SK Foods, Gregory R. Pruett of Ingomar, and Stuart Woolf of Los Gatos are all members of CLFP's Board of Directors.  Alan Huey of SK Foods also serves as a Vice Chairman for the organization.  Alan Huey of SK Foods also serves on CLFP's Executive Committee.  CLFP's own marketing brochure that the CLFP "consistently has provided a vehicle for us to meet and work with other industry participants."

43.      Defendants Ingomar, Los Gatos, and SK Foods also participate in the World Processing Tomato Council ("WPTC"), an international non-profit organization founded in 1988 representing the tomato processing industry.  Currently, its members represent more than 90% of the volume of tomatoes processed worldwide.  The WPTC's objectives include create permanent links between professional grower and/or processor organizations, in order to coordinate actions undertaken to safeguard their interests; study and recommend to member organizations any action intended to better organize the markets and favor fair competition; and to undertake any action, in

agreement with its members, in view to increase consumption of tomato products.

44.     Defendants also have the opportunity to collude through the Processed Tomato Foundation, an organization founded in 1989 as a joint partnership between California tomato growers and processors to address food safety and environmental and sustainability issues.

45.     Ready access to industry data facilitates the defendants' effectuation and monitoring of the conspiracy.  The distribution of this type of information within the industry has allowed defendants to police their conspiracy.

## DEFENDANTS' ANTITRUST VIOLATIONS

46.     Beginning at least as early as April of 2006, and continuing until at least the date of the filing of this Complaint, the exact dates being unknown to Plaintiff, Defendant and their co-conspirators engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix maintain or stabilize the price of Processed Tomato Products in the United States.

47.     In formulating and effectuating the contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain, and/or stabilize the price of Processed Tomato Products sold in the United States.  These activities included the following:

    a.     Defendants participated in meetings and/or conversations; including through various trade organizations and conventions, to discuss the price of Processed Tomato Products in the United States;

    b.     Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of Processed Tomato products sold in the United States;

    c.     Defendants agreed during those meetings and conversations to fix the price of Processed Tomato Products;

    d.     Defendants issued price announcements and price quotations in accordance with their agreements; and

    e.     Defendants allocated customers in furtherance of their conspiracy.

48.     Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in the Complaint.

49.     During and throughout the period of the conspiracy alleged in this Complaint, Plaintiff and members of the Class purchased Processed Tomato Products from Defendants (or their subsidiaries or controlled affiliates) or their co-conspirators at inflated and supracompetitive prices.

50.     Defendants' contract, combination or conspiracy constitutes and unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act.

51.     As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the class have been injured in their business and property in that they have paid more for Processed Tomato Products than they would have paid in a competitive market.

52.     The unlawful contract, combination or conspiracy has had the following effects, among others:

    a.     price competition in the markets for Processed Tomato Products has been artificially restrained;

    b.     prices for Processed Tomato Products sold by the Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

    c.     purchasers of Processed Tomato products from the Defendants have been deprived of the benefit of free and open competition in the markets for Processed Tomato Products.

**GOVERNMENT ANTITRUST INVESTIGATION**

53.     On September 23, 2008, it was disclosed that the Antitrust Division of the DOJ had begun an investigation into possible anti-competitive practices in the tomato processing industry.  The criminal investigation involves possible price-fixing by major California tomato processors.  A federal grand jury in this district has issued subpoenas to the tomato processors. According to Brian Maschler, an attorney for SK Foods, the government had sought information about price-fixing at the same time Federal Bureau of Investigation ("FBI") and Internal Revenue Service ("IRS") agents served a series of search warrants on tomato processors and seized millions of pages of documents from them.

54.     The tomato price fixing investigation grew out of a probe into allegations that Rahal, President of Intramark, was working with SK Foods (particularly Scott Salyer, its CEO, and its Vice-Presidents Alan Huey, Tony Manuel, Jeff Beasley and Michael Poretti) to bribe buyers at six major food companies (AGUSA, Kraft Foods, Safeway Stores, Frito-Lay Foods, B&G Foods, and Conagra) to pay inflated prices for tomato paste and chili peppers.  Documents filed by the Federal Bureau of Investigation ("FBI") in a federal forfeiture proceeding (*United States v. Approximately $415,000 In U.S. Currency*, No. 2:08-CV-01899-GEB-GGH (E.D. Cal.)) initiated in this district, including a lengthy declaration filed by Paul S. Artley, an FBI Special Agent, reveal that in wiretaps and raids carried out as part of the bribery probe, the investigators discovered evidence of a wider-price fixing conspiracy.

55.     On December 10, 2008, the DOJ filed an information against Rahal in this district (*United States v. Rahal*, No. 2:08-CR-0566 LKK (E.D. Cal.)) and announced that he had agreed to plead guilty to money laundering, racketeering and antitrust charges and agreed to forfeit $600,000 in illegally gotten gains.  Although not named as a defendant, SK Foods was identified as a racketeering enterprise.  The information charged that from at least as early as February of 2006 through at least April of 2008, Rahal and his co-conspirators "entered into and engaged in a combination and conspiracy to suppress and restrain competition for processed tomato products sold in the United States" which was accomplished through, *inter alia*: (a) allocation among the co-conspirators of contracts for the sale of such products and (b) fixing the prices of, and rigging bids for, the sale of such products.  The charge against Rahal was announced as the first in an ongoing investigation by the DOJ, the FBI and the United States Attorney's office in Sacramento.

56.     On December 17, 2008, Rahal pled guilty to the charges against him. The guilty plea contains the following facts regarding the antitrust charge:

> Beginning at least as early as February 2006 and continuing until approximately April 2008, Rahal participated in and aided and abetted a conspiracy to fix prices, allocate contracts, and rig bids for processed tomato products, including tomato paste and diced tomatoes. The primary purpose of this conspiracy was to eliminate competition and fix the price of processed tomato products sold in the United States.  During the relevant time, Rahal was the owner and president of Intramark USA Inc., a broker selling processed tomato products for itself and on behalf of others. Rahal and his co-conspirators reached agreement to fix the prices to be charged to customers in the United States for processed tomato products in the Eastern District of California and elsewhere.  To carry out their

agreements, Rahal and his co-conspirators submitted artificially inflated bids and price quotations. Rahal also acted to assist in enforcing the agreements, by obtaining and distributing information about prices offered by co-conspirators and competitors to the subject customers.  In at least one instance, a co-conspirator withdrew a quote that did not comply with agreed-to prices after being confronted with information obtained by Rahal from the customer.

57.     In a press release announcing the guilty plea, W. McGregor Scott, the U.S. Attorney for the Eastern District of California, said: "[a] large portion of the tomatoes used by food product manufacturers nationwide are harvested and processed here in the Eastern District of California.  We must ensure that the tomato processing industry is free of corruption, kickbacks and illegal collusion."

58.     In this same press release, Acting Attorney General Deborah A. Garza stated: "[t]his conduct deprived the purchasers of processed tomato products of the benefits of a competitive marketplace, ultimately causing American consumers to pay higher prices for these everyday staples…. The Antitrust Division will continue to prosecute vigorously those who defraud American consumers."

59.     Brian Maschler has also revealed that federal investigators were investigating the CTEG partnership formed by Ingomar, Los Gatos and SK Foods.  CTEG's activities were suspended shortly after the federal raids described above.

60.     As one industry insider has said, "[t]his reads like a Mafia Hollywood story. Having spent the last 20 years in the tomato business I know how corrupt it is. It used to be at the field level and now it is at the CEO level."  Consistent with this insider's description of the tomato business, on June 7, 2007, Scott Salyer, an owner and principal of SK Foods reportedly stated to his newly hired president, Glen McClaran, "You can take this ethics book and shove it up your ass.  We have always manipulated inventory and will continue to.  We will lie to anyone outside the circle, but not to each other."

## THE CAPPER-VOLSTEAD ACT DOES NOT IMMUNIZE

## THE CHALLENGED CONDUCT.

61.    The 1922 Capper-Volstead Act (7 U.S.C.A. § 291, et seq.) provides an exemption from antitrust law for associations and cooperatives compromised of agricultural producers.  The United States Supreme Court has noted that the antitrust immunity provided by Capper-Volstead is "limited" and does not exempt all conduct from review under the Sherman Act.

62.    The Capper-Volstead Act applies only to collective conduct that takes place within organizations that meet specific criteria.   The Act protects an association and its members from antitrust scrutiny, provided that 1) the association is operated for the mutual benefit of its members; 2) no member of the association is allowed more than one vote because of the amount of stock or membership capital he may own therein, or that the association does not pay dividends on stock or membership capital in excess of 8 per centum per annum; and 3) the association shall not deal in the products of nonmembers to an amount greater in value than such as are handled by it for members.   There is no evidence that defendants belong to any association that meets these requirements.

63.    The Act also provides that protected associations may act collectively, with respect to agricultural products, in "processing, preparing for market, handling, and marketing in interstate and foreign commerce."   The term "marketing" has been interpreted by case law to immunize certain coordinated price-setting activities within an otherwise qualified agricultural organization, however the defendants do not belong to any qualifying organization whose stated purpose concerns the setting of prices for tomato products intended for sale in domestic and interstate commerce.   The Act is designed to provide immunity for groups of farming entities who operate openly and transparently through associations established for the purpose of setting prices, not for those who make secret price-fixing agreements as alleged herein.

64.     The Capper-Volstead Act also only protects "persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers." This phrase has been defined narrowly and does not extend to a processor of agricultural products or any person or entity not engaged in farming, planting, ranching, and growing.   Capper-Volstead immunity will not protect an association or any of its members if even one member fails to qualify as a "person[] engaged in the production of agricultural products."   The conspiracy alleged herein includes individuals and entities that do not qualify as persons "engaged in the production of agricultural products."

65.     Case law interpreting the Act has made it clear that the Act did not leave co-operatives free to engage in practices against other persons in order to monopolize trade, or restrain and suppress competition with the cooperative.  Here, defendants engaged in anticompetitive practices that were so far outside the legitimate objects of an agricultural cooperative that they would constitute clear violations of the Sherman Act.

## CLASS ACTION ALLEGATIONS

66.     Plaintiff brings this action on behalf of itself and as a Class action under the provisions of Rule 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons and entities in the United States who purchased processed tomato products, including but not limited to tomato paste, diced tomatoes, and tomato sauces ("Processed Tomato Products") directly from any defendant between February 1, 2006 and the present.  This class excludes any judicial officer who is assigned to hear any aspect of this action, governmental entities, defendants, co-conspirators, other sellers or providers of Processed Tomato Products, and the present and former parents, predecessors, subsidiaries and affiliates of the foregoing.

67.     Plaintiff believes that there are at least thousands of Class members as above described, the exact number and their identities being known by defendants, making the Class so

numerous and geographically dispersed that joinder of all members in impracticable.

68.     There are questions of law and fact common to the Class, which questions relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

a.     Whether defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of Processed Tomato Products and/or engaged in market allocation for those services sold in the United States.

b.     The identity of the participants in the conspiracy;

c.     The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by defendants and their co-conspirators in furtherance of the conspiracy;

d.     Whether the alleged conspiracy violated Section 1 of the Sherman Act;

e.     Whether the conduct of defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of plaintiff and other members of the Class;

f.     The effect of defendants' conspiracy on the prices of Processed Tomato Products sold in the United States during the Class Period; and

g.     The appropriate measure of damages sustained by plaintiff and other members of the Class.

69.     Plaintiff is a direct purchaser of Processed Tomato Products and its interests are coincident with and not antagonistic to those of the other members of the Class.  Plaintiff is a member of the Class, has claims that are typical of the claims of the Class members, and will fairly and adequately protect the interests of the members of the Class.  In addition, plaintiff is

represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

70.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

71.     Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

72.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

73.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous individual actions would engender.  The Class is readily definable and is one for which records should exist in the files of defendants and their co-conspirators, and prosecution as a class action will eliminate the possibility of repetitious litigation.  Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

74.     Plaintiff had no knowledge of the combination and conspiracy alleged herein, or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence, prior to September 23, 2008, when it was revealed that the DOJ was investigating Processed Tomato Products.

75.      Plaintiff could not have discovered the existence of the combination and conspiracy alleged herein at an earlier date by the exercise of reasonable due diligence because of the deceptive practices and techniques of secrecy employed by the defendants and their co-conspirators to avoid detection and affirmatively conceal such violations.  For example, Rahal pled guilty to conspiring with defendant SK Foods to "construct[] and transmitt[] to its customers fraudulent financial and business information" during the class period.   In one specific instance, "as part of a scheme to defraud ConAgra in June 2007, Rahal arranged for SK Foods to fabricate and backdate an invoice between SK Foods and Hatch Foods ("Hatch"), a ConAgra competitor (without Hatch's knowledge), which reflected a false and inflated price paid by Hatch for tomato product from SK Foods. The fraudulent invoice, which falsely reflected that SK Foods was charging Hatch for canned tomato product at a rate 39% higher than it actually was, was transmitted to ConAgra in an effort to ensure ConAgra signed a three-year contract for tomato paste with SK Foods, at a price of approximately $74,570,000."

76.      Because the contract, combination, or conspiracy was kept secret by the defendants, Plaintiff was unaware of the fact that prices of Processed Tomato Products were secretly raised, fixed, maintained or stabilized as alleged herein.

77.      As a result of the fraudulent concealment of the conspiracy, plaintiff asserts the tolling of the applicable statute of limitations affecting the causes of action by plaintiff and the members of the Class.

78.      As late as November of 2008, Scott Salyer of SK Foods was giving an interview to *Tomato News* magazine wherein he falsely asserted that SK Foods had not committed any illegal conduct and had not engaged in any price-fixing.

/ / /

/ / /

HAUSFELD LLP
ATTORNEYS AT LAW

CLASS ACTION COMPLAINT            - 21 -

## **FIRST CAUSE OF ACTION**

### **Violation of Section 1 of the Sherman Act – 15 U.S.C. § 1**

79.     Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint.

80.     Beginning at least as early as February 1, 2006, and continuing thereafter, defendants and their co-conspirators, by and through their officers, directors, employees, agents, or other representatives, entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for Processed Tomato Products in the United States, and its territories and possessions, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

81.     Defendants' unlawful conduct resulted in artificially high prices charged by defendants and their co-conspirators to plaintiff and the members of the Class for Processed Tomato Products.

82.     Plaintiff and members of the Class had to pay more for Processed Tomato Products than they would have paid in a competitive marketplace.

83.     Plaintiff seeks to recover for these overcharge damages.

84.     As a direct and proximate result of defendants' scheme, plaintiff and the members of the Class have been injured and financially damaged in their respective businesses and property, in amounts which are presently undetermined.  Plaintiff's injuries consist of paying higher prices to purchase Processed Tomato Products than it would have paid absent defendants' conduct. Plaintiff's injuries are of the type the antitrust laws were designed to prevent and flow from that which makes defendants' conduct unlawful.

/ / /

/ / /

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays as follows:

A.      That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure.

B.      That the contract, combination or conspiracy, and the acts done in furtherance thereof by defendants and their co-conspirators, be adjudged to have been in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

C.      That judgment be entered for plaintiff and members of the Class against defendants for three times the amount of damages sustained by plaintiff and the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees.

D.      That defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect.

E.      That plaintiff and members of the Class have such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

**JURY DEMAND**

2      Plaintiff demands a jury trial, pursuant to Federal Rule of Civil Procedure 38(b), of all

3   triable issues.

4   Dated: January 5, 2009                    Respectfully submitted,

5

6                                               /s/ Clinton P. Walker, Esq.
                                              ROGER M. SCHRIMP (SBN 39379)
7                                             CLINTON P. WALKER (SBN 151560)
                                              **DAMRELL, NELSON, SCHRIMP,**
8                                                **PALLIOS, PACHER & SILVA**
                                              1601 I Street, Fifth Floor
9                                             Modesto, CA 95354
                                              Telephone: (209) 526-3500
10                                            Facsimile: (209) 526-3534
                                              rschrimp@damrell.com
11                                            cwalker@damrell.com

12                                            MICHAEL P. LEHMANN (SBN 77152)
                                              CHRISTOPHER L. LEBSOCK (SBN 184546)
13                                            JON T. KING (SBN 205073)
                                              ARTHUR N. BAILEY (SBN 248460)
14                                            **HAUSFELD LLP**
                                              44 Montgomery Street, Suite 3400
15                                            San Francisco, CA 94104
                                              Telephone: (415) 633-1908
16                                            Facsimile: (415) 358-4980
                                              mlehmann@hausfeldllp.com
17                                            clebsock@hausfeldllp.com
                                              jking@hausfeldllp.com
18                                            abailey@hausfeldllp.com

19                                            MICHAEL D. HAUSFELD
                                              MEGAN E. JONES
20                                            HILARY K. RATWAY
                                              **HAUSFELD LLP**
21                                            1146 19th Street, N.W., 5th Floor
                                              Washington, D.C. 20036
22                                            Telephone:  (202) 579-1089
                                              Facsimile:  (202) 747-5713
23                                            mhausfeld@hausfeldllp.com

24                                            GUIDO SAVERI (SBN 22349)
                                              R. ALEXANDER SAVERI (SBN 173102)
25                                            **SAVERI & SAVERI, INC.**
                                              706 Sansome Street
26                                            San Francisco, CA 94111
                                              Telephone: (415) 217-6810
27                                            Facsimile: (415) 217-6813
                                              guido@saveri.com
28                                            rick@saveri.com

CLASS ACTION COMPLAINT                  - 24 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CRAIG C. CORBITT (SBN 83251)
FRANCIS O. SCARPULLA (SBN 41059)
HENRY A. CIRILLO (SBN 131527)
**ZELLE HOFMANN VOELBEL MASON &
GETTE**
44 Montgomery Street
Suite 3400
San Francisco, CA 94104
Telephone: (415) 693-0700
Facsimile: (415) 693-0770
ccorbitt@zelle.com
fscarpulla@zelle.com
hcirillo@zelle.com

ALLAN STEYER (SBN 100318)
**STEYER LOWENTHAL BOODROKAS
ALVAREZ & SMITH LLP**
One California Street
Third Floor
San Francisco, CA 94111
Telephone: (415) 421-3400
Facsimile: (415) 421-2234
asteyer@steyerlaw.com

STEVEN A. KANNER
DOUGLAS A. MILLEN
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road
Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
Facsimile: (224) 632-4521
skanner@fklmlaw.com
dmillen@fklmlaw.com

STEVEN J. GREENFOGEL
**MEREDITH COHEN GREENFOGEL &
SKIRNIK PC**
1521 Locust Street, 8th Floor
Philadelphia, PA 19102
Telephone: (215) 564-5182
Facsimile: (215) 569-0958
sgreenfogel@mcgslaw.com

BRUCE L. SIMON
**PEARSON SIMON SOTER WARSHAW
PENNY LLP**
44 Montgomery Street, Suite 1430
San Francisco, CA 94104
Telephone: (415) 433-9000
Fax: (415) 433-9008
bsimon@psswplaw.com

1

2    ARTHUR N. BAILEY
     **ARTHUR N. BAILEY & ASSOCIATES**
3    111 West Second Street
     Jamestown, NY 14701
     Telephone: (716) 664-2967
4    Facsimile: (716) 664-2983
     abailey@alltel.net
5

6    VINCENT J. ESADES
     **HEINS MILLS & OLSON, P.L.C.**
7    310 Clifton Avenue
     Minneapolis, MN 55403
8    Telephone: (612) 338-4605
     Fax: (612) 338-4692
9

10   *Attorneys for Plaintiff Bruce Foods Corporation and*
     *the proposed Class*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28